UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JEFFREY WASHINGTON, | ) | |
|     *Petitioner*, | ) | |
| | ) | |
|     *vs.* | ) | 2:12-cv-56-JMS-DKL |
| | ) | |
| SUPERINTENDENT, WABASH VALLEY COR- | ) | |
| RECTIONAL FACILITY, | ) | |
|     *Respondent.* | ) | |

**AMENDED ENTRY DISCUSSING PETITION FOR WRIT OF
HABEAS CORPUS AND DENYING CERTIFICATE OF APPEALABILITY[1]**

Presently pending before the Court is Petitioner Jeffrey Washington's Petition for a Writ of Habeas Corpus. [Dkt. 1.] For the reasons explained herein, the Court finds that Washington's petition for a writ of habeas corpus must be denied and the action dismissed with prejudice. In addition, the Court finds that a certificate of appealability should not issue.

## I.
### BACKGROUND

The following underlying facts were set forth by the Indiana Supreme Court on Washington's direct appeal and are presumed to be correct because they have not been rebutted by clear and convincing evidence, 28 U.S.C. § 2254(e)(1):

> The recent end of a romantic relationship with the victim Sandra Bass apparently upset Washington. At some point in the late evening hours of December 5, 2001, he walked to the apartment complex where Bass lived with her three children and saw Bass and another man leaving the apartment complex in Bass' car. Bass returned a short time later, parked her car in her assigned spot and was getting out of her car when Washington confronted her. Armed with a butcher knife and wearing a pair of socks over his hands, Washington shoved Bass back into the car and stabbed her at least thirteen times. Washington fled the complex

---

[1] The Court issued an entry denying Washington's petition on August 29, 2013, [dkt. 21], but for the reasons stated in a separate order issued previously, [dkt. 25], the Court issues this Amended Entry to address some of Washington's claims on the merits that it previously found to be procedurally defaulted.

and hid the knife and his clothes in separate locations. Bass bled to death from the stab wounds. The following day, Washington was apprehended and questioned at length by the police. After an initial attempt to provide the police with an alibi for the previous night, Washington admitted stabbing Bass.

The State charged Washington with murder. Alleging that he committed the murder while lying in wait, Ind. Code § 35–50–2–9(b)(3), and while on probation, I.C. § 35–50–2–9(b)(9)(C), the State also sought life imprisonment without parole. After a trial by jury Washington was convicted as charged. At the penalty phase of trial, the jury recommended that a sentence of life imprisonment without parole be imposed. The trial court thereafter sentenced Washington consistent with the jury's recommendation.

*Washington v. State*, 808 N.E.2d 617, 620-21 (Ind. 2004); *see also Washington v. State*, 953 N.E.2d 1280 (Ind. Ct. App. 2011) (post-conviction appellate court adopting background set forth by Indiana Supreme Court) (unpublished).

On May 11, 2005, Washington filed a *pro se* petition for post-conviction relief that was amended by appointed counsel on August 5, 2010. [Dkt. 10-2 at 2.] Washington raised four types of issues on post-conviction review:

- Ineffective assistance of counsel based on counsel's failure to 1) appropriately investigate and determine Washington's mental health status; 2) effectively remediate an inappropriate comment by the prosecutor; and 3) effectively prepare and present the defense of voluntary manslaughter;

- Washington's competence to stand trial, based on his emotional reaction to certain photographs during trial;

- Alleged prosecutorial misconduct during trial based on comments made by the prosecutor while arguing the admissibility of certain photographs; and

- The constitutionality of Washington's sentence for life without parole ("LWOP").

[Dkt. 10-9 at 19-20.] The post-conviction court held an evidentiary hearing on October 14, 2010, and denied Washington's petition on December 31, 2010. [*Id.* at 10-31.]

Washington appealed the denial of his petition for post-conviction relief to the Indiana Court of Appeals.  He only raised issues surrounding the alleged ineffectiveness of his trial counsel, particularly at the penalty phase of his LWOP trial, where he contended that

> [t]rial counsel believed that a determination of guilt was certain, yet still neglected to conduct any investigation into the possible punishments for Washington. Where ample and significant evidence of mitigation exists and was readily available, Washington was prejudiced by counsel's failure.

[Dkt. 10-9 at 7-8.]  In relevant part, Washington argued that his trial counsel "entirely neglected to conduct any mitigation investigation" and that "[a]dequate investigation would have alerted counsel to Washington's multiple, severe, mental illnesses."  [*Id.* at 11-12.]

In addressing Washington's appeal, the Indiana Court of Appeals set forth additional facts relevant to his ineffective assistance of trial counsel claim, which are presumed to be correct because they have not been rebutted by clear and convincing evidence, 28 U.S.C. § 2254(e)(1):

> At the outset of the case, defense counsel sought psychiatric evaluations of Washington for a potential insanity defense.  Drs. Thomas F. Liffick and David K. Hilton each examined Washington and submitted written reports to the trial court. Dr. Liffick's report noted in part:
>
>> Mental Health Center records indicate that Mr. Washington was first seen in April, 1979 for a court ordered evaluation because he was caught stealing.  He was said at the time to have an I.Q. of 70 and was diagnosed with "Minimal Brain Dysfunction" and as having a "Conduct Disorder".  He was seen again in March, 1982 because of "repeated delinquent acts".  At that time, he had failed a placement at Hillcrest-Washington Youth Home and was referred to a residential treatment setting.  He was seen again in October, 1994, when in fact I had discharged him from the hospital after a one night stay.  At that time, he had overdosed on an antibiotic and had, at that time, just been discharged from an 8 year prison sentence for burglary and battery.  He was diagnosed at that time as having an Adjustment Disorder.  He was also seen in February, 1997 subsequent to an arrest for stalking.  He was also given tests at that time which indicated an I.Q. in the 81–87 range with a 4th grade reading level.  Personality Inventory also indicated that he

- 3 -

exaggerated symptoms for effect.  He was given a diagnosis at that time of Antisocial Personality Disorder.

Mr. Washington has a 9th grade education and was expelled from school in the 10th grade for fighting.  He has had arrests previously for burglary and robbery in 1986, for voyeurism in 1995 and for stalking in 1996....

The mental status is that of a well-developed, well nourished, handsome young man who appears about his stated age....

Thought processes are logical sequential, relevant and spontaneous. There are no indications of any autistic thinking.  Thought content reveals no psychotic symptoms at any time.  There are no indications of any preoccupations or other aberrations of thought content....

My impression clinically is that of an ANTISOCIAL PERSONALITY DISORDER.  I see no evidence of any significant psychiatric illness or otherwise.  Mr. Washington has demonstrated periods in the past that could be diagnosed as periods of Adjustment Disorder in response to situational stresses.  It is, in fact, possible that he was experiencing just such an adjustment disorder as a result of the loss of this relationship at the time of the events that have led to his arrest. . . .

Dr. Hilton's report noted:

Mr. Washington has a history of antisocial behavior dating back to his youth.  By his report in 1982 he broke into a house, resulting in his placement at Hillcrest-Washington Youth Home.  Also as a teenager, he was sent to Gebault [sic] School for Boys, reportedly for coercing another male child to perform oral sex on him.  While at Gebault [sic], he allegedly "patted" a female employee on the shoulder, resulting in an assault charge and his first stay at Indiana Boys' School.  He also reportedly was sent to Boys' School on a second occasion for stealing a car stereo.

At 17 years of age, he was waived from juvenile to adult court on a charge of burglary and robbery.  He was arrested in September, 1986 on these charges and, when convicted, served 7 years in prison, one year in jail, and 3 months on house arrest.

In 1996, he was convicted of stalking an ex-girlfriend as well as resisting arrest and escape.  He spent 3 months in jail followed by approximately 4 years in prison.

- 4 -

Mr. Washington was first seen at the Southwestern Indiana Mental Health Center in April, 1979 when he was 10 years and 4 months of age. He underwent a psychological evaluation by Preston Phillips at the request of the Posey County Circuit Court in relation to an incident in which he had admitted to some theft.

Those records show that there was prior history of the use of Ritalin for hyperactivity symptoms, but he had been off of the medication for some time prior to the testing. It was also pointed out that there was history of inadequate parental supervision and nurturance in the home. During the testing, no attentional problems or problems with hyperactivity were observed. The WISC–R showed a full-scale IQ of 70, which was felt to demonstrate borderline intellectual functioning. His academic achievement, however, was good in relation to his intellectual ability, but was still well below what would have been expected for his grade placement. The Bender Gestalt Test was consistent with minimal brain dysfunction (ADHD).

He was seen in therapy by Mr. Bill Curtis and was felt to be socioculturally disadvantaged, neglected, and unsupervised. His treatment diagnosis was Unsocialized Disturbance of Conduct, the old terminology for what now would be considered a Conduct Disorder.

<u>Mental Status Examination</u>
The defendant was noted to be a well developed, well nourished, 33 year old, black male in no acute distress....

On Folstein's Mini-Mental State exam, the defendant scored a perfect score of 30 out of 30.... There was no evidence of fragmentation or disorganization of his form of thought. He voiced no obvious delusions. He denied ever having any history of auditory or visual hallucinations at any time in his life. He also denied ever having experienced ideas of reference, thought insertion, or thought broadcasting.

<u>Impression</u>
Axis I: No definitive diagnosis, although ADJUSTMENT DISORDER WITH DEPRESSED MOOD is possible.

Axis II: ANTISOCIAL PERSONALITY DISORDER

There also was some indication in his history that, contrary to his own statement, there may have been a tendency in the past toward violent behavior toward women. This is suggested by the prior ar-

- 5 -

> rest for stalking an ex-girlfriend and may have been related to his
> transform from Gebault [sic] School for Boys to the Indiana Boys'
> School during his youth. . . .

Both Drs. Liffick and Hilton concluded that Washington suffered no significant mental disease or defect that prevented him from appreciating the wrongfulness of the acts charged.

Defense counsel was also aware before trial of Washington's extensive criminal history. Washington's criminal record included juvenile delinquency adjudications for theft, trespass, burglary, and sexual abuse and adult convictions for robbery, voyeurism, escape, and stalking. One of defense counsel's main objectives at trial was to limit discussion of Washington's prior convictions as much as possible.

Washington was tried by a jury in 2002 and found guilty as charged.

Defense counsel called two witnesses in the penalty phase of trial: Washington's cousin and grandmother. They testified that before the murder, Washington had been attempting to address his anger through counseling. Defense counsel reviewed the psychiatric evaluations performed by Drs. Liffick and Hilton but elected not to introduce them. Nor did he offer independent evidence of Washington's troubled childhood.

The jury found beyond a reasonable doubt that Washington committed the murder while lying in wait and while on probation in another case. The jury also found that those two aggravating circumstances outweighed any purported mitigators. The jury recommended a sentence of life without the possibility of parole, and the trial court sentenced Washington consistent with the jury's recommendation.

Our Supreme Court affirmed Washington's conviction and sentence on direct appeal. *See Washington*, 808 N.E.2d at 620.

Washington next sought post-conviction relief alleging ineffective assistance of counsel. Washington averred, among other things, that trial counsel rendered ineffective assistance by inadequately investigating and offering during the penalty phase evidence of his psychiatric history and abusive childhood.

The post-conviction court convened a hearing in 2010. Washington called several witnesses, including his maternal aunts, pastor, and psychologist Thomas Holsworth. Washington's aunts and pastor recounted Washington's troubled youth. They also testified that Washington assumed the role of housekeeper and babysitter and that he would assist the pastor at his farm and church. Dr. Holsworth submitted a psychological evaluation of Washington. Dr. Holsworth diagnosed Washington with several psychological, social, and intellectual impairments, but his observations were largely consistent with those of Drs. Liffick and Hilton. Dr.

Holsworth noted that Washington is a "hostile individual," "tends to hold grudges," "is quick to feel that he is being treated inequitably," "resents rules," "can act out without guilt," "does not easily learn from experience," displays a "degree of explosiveness and propensity for violence," and is unable "to participate meaningfully in some forms of treatment."

The post-conviction court issued findings of fact and conclusions of law denying relief. The court concluded in relevant part that counsel "was aware of Mr. Washington's troubled childhood, prior criminal history and Dr. Liffick's and Dr. Hilton's evaluations. [Counsel] chose to limit, to the extent he could, the jury's knowledge of Mr. Washington's prior criminal history. Assuming *arguendo*, [counsel] slipped below professional norms in not obtaining and presenting a more detailed mental evaluation, there is no reasonable probability the jury would have found differently."

*Washington*, 953 N.E.2d 1280 at *3-*9.

On September 19, 2011, the Indiana Court of Appeals affirmed the decision of the post-conviction court. *Id.* at *14-*17. The Court of Appeals concluded that Washington had not proven that counsel's performance was deficient and, even assuming that it was, he was not able to show prejudice for counsel's alleged omissions. *Id.* Washington filed a petition to transfer with the Indiana Supreme Court, but it denied his petition on December 19, 2011. [Dkt. 10-4 at 5.] Washington filed a Petition for Writ of Habeas Corpus, [dkt. 1], which is now fully briefed.

## II.
### STANDARD OF REVIEW

A federal court may grant habeas relief only if the petitioner demonstrates that he is in custody "in violation of the Constitution or laws ... of the United States." 28 U.S.C. § 2254(a). "Under the current regime governing federal habeas corpus for state prison inmates, the inmate must show, so far as bears on this case, that the state court which convicted him unreasonably applied a federal doctrine declared by the United States Supreme Court." *Redmond v. Kingston*, 240 F.3d 590 (7th Cir. 2001) (citing 28 U.S.C. § 2254(d)(1)); *Williams v. Taylor*, 529 U.S. 362 (2000); *Morgan v. Krenke*, 232 F.3d 562 (7th Cir. 2000). "The habeas applicant has the burden

of proof to show that the application of federal law was unreasonable." *Harding v. Sternes*, 380 F.3d 1034, 1043 (7th Cir. 2004) (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)).

In addition to the substantive standard noted above, "[o]ut of respect for finality, comity, and the orderly administration of justice, a federal court will not entertain a procedurally default-ed constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default." *Dretke v. Haley*, 541 U.S. 386, 388 (2004).  Before a federal court can en-tertain a petition for habeas corpus, a state prisoner must exhaust his state remedies by presenting his claims fully and fairly to the state courts. *Howard v. O'Sullivan*, 185 F.3d 721, 725 (7th Cir. 1999) (citing 28 U.S.C. 2254(b)(1)(A), (c); *O'Sullivan v. Boerckel*, 526 U.S. 838 (1999); *Pa-trasso v. Nelson*, 121 F.3d 297, 301 (7th Cir. 1997)).  "A state prisoner ... may obtain federal ha-beas review of his claim only if he has exhausted his state remedies and avoided procedurally defaulting his claim." *Thomas v. McCaughtry*, 201 F.3d 995, 999 (7th Cir. 2000).  Procedural default "occurs when a claim could have been but was not presented to the state court and can-not, at the time that the federal court reviews the habeas petition, be presented to the state court." *Resnover v. Pearson*, 965 F.2d 1453, 1458 (7th Cir. 1992), *cert. denied*.  When procedural de-fault has occurred, it can be overcome if a habeas petitioner "can demonstrate either (a) cause for the default and prejudice (*i.e.*, the errors worked to the petitioner's 'actual and substantial disad-vantage,'); or (b) that failure to consider his claim would result in a fundamental miscarriage of justice (*i.e.*, a claim of actual innocence)." *Conner v. McBride*, 375 F.3d at 649 (internal cita-tions omitted).  "Cause" for a procedural default exists if the petitioner can demonstrate that "some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Prejudice is demonstrat-

ed by showing that the errors worked to the petitioner's "actual and substantial disadvantage." *United States v. Frady*, 456 U.S. 152, 170 (1982).

## III.
### DISCUSSION

### A.  Ineffective Assistance of Counsel

Washington contends that his Sixth Amendment right to counsel was violated by ineffective assistance of his trial counsel.  Specifically, he claims that his trial counsel was ineffective because he allegedly did not prepare for the penalty phase by seeking mitigating evidence, such as mental health testimony or testimony regarding Washington's troubled childhood.  [Dkts. 1 at 4; 17 at 3.]

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, governs the Court's assessment of Washington's claims.  When a state court decides a constitutional claim such as the right to counsel on the merits, AEDPA provides that a writ of habeas corpus shall not be granted unless the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence" before the state court.  28 U.S.C. § 2254(d)(1)-(2).  The Court typically considers the last reasoned opinion of a state collateral review system, which here is the Indiana Court of Appeals.  *Woolley v. Rednour*, 702 F.3d 411, 421 (7th Cir. 2012).  In applying AEDPA's "difficult to meet ... and highly deferential standard," the Court will give the Indiana Court of Appeals' decision "the benefit of the doubt." *Cullen v. Pinholster*, 131 S.Ct. 1388, 1391 (2011).

To demonstrate that the right to counsel was violated by ineffective assistance, Washington must meet the familiar two-part standard set forth in *Strickland v. Washington*, 466 U.S. 668

(1984).  He must show (1) that his counsel's performance was deficient, meaning that it fell below an "objective standard of reasonableness" informed by "prevailing professional norms," and (2) that his counsel's deficient performance prejudiced him, meaning that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 687-88.  In evaluating an attorney's performance, "courts must defer to any strategic decision the lawyer made that falls within the 'wide range of reasonable professional assistance,' even if that strategy was ultimately unsuccessful." *Shaw v. Wilson,* --- F.3d ---, 2013 WL 3814671, at *5 (7th Cir. 2013) (quoting *Strickland*, 466 U.S. at 689).

On habeas review, however, a federal court's task is not a *de novo* review of an ineffective assistance of counsel claim under *Strickland*. *McElvaney v. Pollard*, --- F.3d ---, 2013 WL 4423669, at *4 (7th Cir. 2013).  Instead, given the confines of AEDPA, the inquiry is limited to whether the Indiana Court of Appeals' determination that Washington was not denied effective assistance of counsel "was contrary to, or involved an unreasonable application of" *Strickland*. *Id.* "This means that 'the question is not whether [Washington's] counsel's actions were reasonable.  The question is whether there is any reasonable argument that [Washington's] counsel satisfied *Strickland*'s deferential standard.'" *Id.* (quoting *Harrington v. Richter*, 131 S.Ct. 770, 788 (2011)).

In affirming the decision of the trial court denying Washington's petition for post-conviction relief, the Indiana Court of Appeals agreed with the post-conviction court that Washington failed to sustain a showing of ineffective assistance:

> First, we cannot say that trial counsel's performance was deficient.  Counsel sought psychiatric evaluations of Washington at the beginning of the case and reviewed the reports for purposes of sentencing.  Counsel chose not to introduce Washington's psychiatric evaluations during the penalty phase, and that decision was more than justifiable.  Washington's evaluations revealed a history of antisocial behavior and aggression toward women, yet no significant and present mental

- 10 -

disability.  As a result, introduction of the psychiatric evidence likely would have been unavailing and even disadvantageous.  Counsel also acted reasonably in not offering childhood-related testimony from Washington's aunts or pastor, who in part characterized Washington as a housekeeper, babysitter, and assistant at the farm and church.  Counsel's concern throughout trial was that the jury would be exposed to Washington's formidable criminal history.  While evidence of Washington's troubled youth likely would not have opened the door to prior convictions, any testimony portraying him as a "helper" or "protector" could have.  *See, e.g.*, *Allen v. State*, 749 N.E.2d 1158, 1173 (Ind. 2001) ("While the evidence of Allen's family history describes the difficult conditions of his childhood, it also contains numerous positive references to Allen's role as a protector of the younger children in his neighborhood and family, his role as 'man of the house,' his tendency to take blame for others, and his practice of stealing to feed his family.  This testimony—which was intertwined with the negative aspects of Allen's youth—is a form of character evidence that could open the door to Allen's criminal history.  Trial counsel's performance was not deficient for not presenting this evidence."), *reh'g denied*.  Counsel was therefore warranted in foregoing the character evidence altogether. *See id.*; *see also* 1 F. Lee Bailey & Kenneth J. Fishman, Criminal Trial Techniques § 32:24 (2009) ("During the cross-examination, the prosecutor may ask a character witness if he or she has ever heard particular rumors or reports derogatory to the defendant's reputation. . . .  If your character witnesses are open to any such attack, do not put them on the stand.").

Finally, even if we assumed *arguendo* that counsel was deficient for failing to introduce the mitigation evidence desired, we would still find an insufficient showing of resultant prejudice.  The jury found beyond a reasonable doubt that Washington committed the murder while lying in wait and while on probation for another offense.  The omitted character testimony from Washington's aunts and pastor was neither substantial nor overwhelmingly favorable.  And while Dr. Holsworth's evaluation included more diagnoses than Dr. Liffick's or Dr. Hilton's, it disclosed the same litany of antisocial and unsympathetic behaviors.  It is thus unclear that Washington would have benefitted from the evaluation's introduction had it been procured for trial.  Accordingly, we find no reasonable probability that, but for counsel's alleged omissions, the jury would have weighed the aggravators and mitigators differently and the outcome of Washington's proceeding would have been different.

*Washington*, 953 N.E.2d 1280 at *14-*17.

Washington's appeal fails under the "doubly" deferential standard of review this Court must apply when reviewing a post-conviction decision applying the standards for ineffective assistance of counsel.  *Harrington*, 131 S.Ct. at 788 ("Establishing that a state court's application

of *Strickland* was unreasonable under § 2254(d) is all the more difficult.  The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so.") (citations and quotations omitted).  Unless Washington persuades the Court that the decision from the Indiana Court of Appeals is "contrary to, or involved an unreasonable application of *Strickland*," he cannot obtain habeas relief.  *See McElvaney*, 2013 WL 4423669 at *4.

The Court concludes that there is no reasonable argument that the Indiana Court of Appeals' decision denying post-conviction relief was contrary to or involved an unreasonable application of *Strickland*.  It is undisputed that Washington's trial counsel was aware of Washington's troubled childhood and prior criminal history.  [Dkt. 10-9 at 30.]  He sought psychiatric evaluations of Washington before trial and reviewed those again before the penalty phase.  [Dkt. 10-11 at 10-11.]  Those evaluations revealed Washington's history of antisocial behavior and aggression toward women but did not support a significant and present mental disability.  [*Id.* at 11.]  Thus, it was not unreasonable for the Indiana Court of Appeals to conclude that Washington's counsel was not deficient for not introducing the reports because they "likely would have been unavailing and even disadvantageous."  [*Id.*]  And as Respondent points out, had Washington's counsel put forth such evidence or called a psychologist such as Dr. Holsworth, who testified at the post-conviction hearing, the State could have presented the tactically excluded evaluations, including one doctor's observation that Washington's history included a "tendency in the past toward violent behavior toward women."  [Dkt. 10-11 at 6.]  Considering that Washington was accused of murdering his ex-girlfriend by lying in wait before stabbing her at least thirteen times, such evidence could have been devastating.  *See Miller v. Anderson*, 255 F.3d 455, 458 (7th Cir. 2001) ("The clearest respect in which the lawyer's representation fell below the minimum level

was the decision to put the psychologist on the stand . . . .  The lawyer did this knowing that Miller had been previously convicted of kidnapping, rape, and sodomy and at the time of the crime for which he was being tried had been free on parole from a life sentence for kidnapping.  The state brought these facts out on cross-examination of the psychologist and they not only destroyed the psychologist's credibility but almost certainly and perhaps decisively bolstered the jury's confidence in Miller's guilt.").

Likewise, the Indiana Court of Appeals' conclusion that Washington's counsel was not deficient for not presenting evidence of his troubled childhood is not unreasonable.  [Dkt. 10-11 at 11.]  It is undisputed that counsel's concern throughout trial was that the jury would be exposed to Washington's formidable criminal history.  [*Id.*]  Included among Washington's numerous prior convictions were convictions for crimes against women, such as stalking and sexual abuse.  [*Id.* at 6.]  It was not unreasonable for the Indiana Court of Appeals to conclude that evidence of Washington's troubled youth was likely to open the door to his prior convictions because his aunt and pastor had also characterized him positively.  [*Id.* (citing *Allen*, 749 N.E.2d at 1173) (holding on post-conviction appeal that trial counsel was not deficient under *Strickland* for not introducing evidence of family history because it was intertwined with positive references that could open the door to criminal history).]  Instead, Washington's counsel presented evidence from Washington's cousin and grandmother but limited them to Washington's demeanor the day of the crime and his attempts to address his anger through counseling.  [Dkts. 10-9 at 21 ¶ 3; 10-11 at 6; 17 at 5.]  Given counsel's goal of avoiding opening the door to evidence of Washington's previous convictions, which he achieved, [dkt. 10-9 at 29], the Court concludes that it was not unreasonable for the Indiana Court of Appeals to conclude that counsel was not deficient for failing to introduce evidence of Washington's troubled childhood.

- 13 -

While Washington's counsel presented limited mitigating evidence, he did present some evidence.  Counsel was aware of Washington's troubled childhood and prior criminal convictions, [dkt. 10-9 at 30], but tactically chose to present evidence that would not open the door to his mental evaluations or extensive criminal history, which exhibited a history of violence towards women.  Thus, Washington's claim boils down to a contention that his counsel did not present *enough* mitigating evidence.  "[S]uch arguments come down to a matter of degrees, which are ill-suited to judicial second-guessing." *Woods v. McBride*, 430 F.3d 813, 826 (7th Cir. 2005) (citing *Conner v. McBride*, 375 F.3d 643, 666 (7th Cir. 2004)).  For these reasons, the Court concludes that the Indiana Court of Appeals was not unreasonable for concluding that Washington failed to establish that his counsel was deficient under *Strickland*.

In the interest of completeness, the Court also finds that even assuming for the sake of the argument that Washington's counsel's performance was deficient, the Indiana Court of Appeals was not unreasonable for concluding that Washington cannot satisfy the prejudice prong of *Strickland*.  Nothing Washington offers convinces the Court that there is a reasonable probability that the additional details would have tipped the scales in his favor at sentencing, thus it was not unreasonable for the Indiana Court of Appeals to conclude that Washington was not prejudiced by counsel's failure to offer the cited evidence.  Indeed, this possibility is even less likely in light of the nature of the crime for which Washington stood trial and the aggravating circumstances presented to the jury.  *Woods*, 430 F.3d at 826.  For these reasons, Washington's ineffective assistance of trial counsel claim fails.

### B.  Claims Raised on Direct Appeal

Washington raises two issues in his petition for habeas relief that were decided against him on direct appeal by the Indiana Supreme Court.  First, he argues that the trial court erred by

denying a motion to suppress an allegedly involuntary confession he made to the police.  [Dkts. 1 at 4-5; 17 at 9-10.]  Second, he argues that the trial court erred by refusing to instruct the jury regarding the lesser-included offense of voluntary manslaughter.  [Dkts. 1 at 5; 17 at 10-11.]

Washington raised these issues on direct appeal to the Indiana Supreme Court, but they were decided against him on the merits.  [Dkt. 10-8; *Washington v. State*, 808 N.E.2d 617, 622-25 (Ind. 2004).]  Washington is only entitled to relief if the Indiana Supreme Court's decision "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States."  *Carter v. Thompson*, 690 F.3d 837, 843 (7th Cir. 2012) (citing 28 U.S.C. § 2254(d)).  A state court decision is contrary to the Supreme Court's "precedent if the state court arrives at a conclusion opposite to that reached by [the] Court on a question of law," or, "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at" an opposite result.  *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006) (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).  A decision applying the correct legal rule to the facts of a case is not "contrary to" within the meaning of § 2254(d)(1). *Garth*, 470 at 710.

On collateral review, the Court "must respect the factual findings of state courts."  *Hall v. Zenk*, 692 F.3d 793, 805 (7th Cir. 2012).  A state court's factual findings are "presumed to be correct" in a federal habeas corpus proceeding "unless they are rebutted by clear and convincing evidence."  *Id.* (citing 28 U.S.C. § 2254(e)(1)).  Washington has not presented any evidence challenging the state court's factual findings regarding his alleged involuntary confession; thus, those findings are presumed to be true.

### 1)  Motion to Suppress Confession

Washington argues that the trial court erred in denying his motion to suppress his confession to the police because it was allegedly involuntary, in violation of the Fifth Amendment of the United States Constitution.  [Dkt. 1 at 4.]  First, Washington argues that it was involuntary because the police allegedly deceived him.  [*Id.*]  Second, Washington contends that the police refused to allow him to remain silent during the interrogation.  [*Id.* at 4-5.]

The Respondent argues that the Indiana Supreme Court's decision on these issues was in accordance with clearly established federal law.  [Dkt. 10 at 18.]  It emphasizes that this Court must presume the facts found by the state court in this case to be correct, and it further contends that there was no objectively unreasonable application of federal precedent.  [*Id.* at 18-20.]

#### a)  Alleged Police Deception

Washington argues that the police used deception on at least six occasions during his interrogation.  [Dkt. 1 at 5.]  He incorporates the arguments he made on direct appeal regarding this issue.  [Dkt. 17 at 9 (incorporating dkts. 10-5 at 17-20; 10-7 at 4-5).]

The Indiana Supreme Court summarized the facts regarding the alleged police deception as follows:

> While in custody Washington was interrogated by at least two different officers, including Heilman and Gary Gilbert.  During the interrogation Officer Heilman made the following statements:
>
> > We'll prove to you her blood's all over your clothes and I'll prove to you that you were there when she died.
> >
> > You got your supposedly your best friend in the world's blood on your clothes.
>
> Officer Gilbert added:
>
> > [W]e've got physical evidence from her blood on your clothes.

> Her blood on your clothes Jeff.

> Those are your clothes, that's her blood on your clothes.

In addition Officer Heilman asserted:

> Your sisters, your grandma and your mother, they've all been talk-
> ing to us all night scared to death, what happened to Jeff.  What's
> he going to do to himself.  *You know they all think you did it.*

*Washington*, 808 N.E.2d at 622 (citations omitted) (emphasis in original).

The Indiana Supreme Court analyzed the circumstances of the interrogation in light of

Washington's claim of police deception and found as follows:

> It is technically true that at the time of the interrogation the officers did not know
> whether Washington's clothing was covered with Bass' blood.  At best this was
> pure conjecture offered as fact.  However, "not all police interrogation statements
> of conjecture, presented as fact, constitute police deception."  Rather, where the
> police have a "good faith basis for their technical falsehood, then their action will
> not be deemed deceptive."  The record shows that at the time of the interrogation,
> the police had recovered clothing that appeared to be bloodstained and had spoken
> with a witness who had seen Washington changing out of those clothes the previ-
> ous night. The clothing had been submitted to the police crime laboratory, alt-
> hough the results had not yet been returned.  We conclude the officers had a good
> faith basis for asserting that Washington's clothing was stained with the victim's
> blood.  Accordingly, the officers' statements were not deceptive.

> Concerning Officer Heilman's statement that "you know they all think you did it"
> Washington does not explain how this statement rendered his confession involun-
> tary.  In like fashion we do not see "an apparent explanation as to why this com-
> ment would render defendant's statement involuntary."

*Washington*, 808 N.E.2d at 622-23 (citations omitted).

A confession is involuntary when it was given in circumstances that were sufficient to

overbear the confessor's free will.  *Johnson v. Pollard*, 559 F.3d 746, 753 (7th Cir. 2009) (citing

*Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)); *see also Weidner v. Thieret*, 866 F.2d 958, 963

(7th Cir. 1989) ("Interrogation becomes constitutionally objectionable only when the circum-

stances prevent the person being questioned from making a rational choice.").  The Court exam-

ines the totality of the circumstances surrounding a confession to determine whether it is volun-

tary. *Johnson*, 559 F.3d at 753. The Court must determine whether the circumstances surrounding a confession would have interfered with the "free and deliberate choice of whether to confess." *Id.* (citation omitted).

The fact that a detective "makes a false or misleading statement during the course of the interrogation would not, by itself, render [a] confession involuntary." *Johnson*, 559 F.3d at 754 (citing *United States v. Harris*, 914 F.2d 927, 933 (7th Cir. 1990)). "The fact that an officer misrepresents the strength of the evidence against a defendant is insufficient, standing alone, to render an otherwise voluntary confession inadmissible." *Johnson*, 559 F.3d at 754 (citations omitted). "An interrogating officer's misrepresentations are neither dispositive of nor irrelevant to the question of whether a defendant's statement was voluntary[;]" instead, "the extent of the misrepresentation" must be evaluated to determine "whether [it] overcame the defendant's will by distorting an otherwise rational choice." *Id.*

Five of the six misrepresentations at issue concern the police's statement that they had Washington's clothes from the night of the murder with Bass' blood on them. As the Indiana Supreme Court noted, at the time of Washington's interrogation the police had recovered clothing that appeared to be bloodstained and had spoken with a witness who had seen Washington changing out of those clothes the previous night. *Washington*, 808 N.E.2d at 622. Thus, while the officers had not yet positively identified Bass' blood on Washington's clothes, misrepresentations about the strength of evidence are insufficient, standing alone, to render Washington's confession inadmissible. *Johnson*, 559 F.3d at 754.

As for Officer Heilman's statement that Washington's family members thought he killed Bass, Washington does not expound upon the arguments he presented on direct appeal to the Indiana Supreme Court. [Dkt. 17 at 8-9 (incorporating arguments on direct appeal).] The Indiana

Supreme Court did not see "an apparent explanation as to why this comment would render defendant's statement involuntary," *Washington*, 808 N.E.2d at 623, and this Court agrees.  It is unclear from the record whether Officer Heilman's statement was or was not true at the time he made it.  But even if it was untrue, it is not the type of misrepresentation that would render Washington's confession involuntary by overcoming his free will by distorting an otherwise rational choice.  Officer Heilman's comment about Washington's family members' belief that Washington killed Bass falls well below the misrepresentations cited by the Seventh Circuit as sufficient for rendering a confession involuntary.  *See Johnson*, 559 F.3d at 754 (citing case where police implied defendant would lose custody of her children and her state financial benefits if she did not cooperate, case where agent misrepresented evidence and promised that defendant would receive a sentence one-tenth of the typical sentence, and case where agent stated that speaking with a lawyer would permanently preclude the defendant from cooperating with police) (citations omitted).

For these reasons, the Court rejects Washington's arguments that he is entitled to habeas relief because allegedly deceptive statements by the police during his interrogation rendered his confession constitutionally infirm.

### b)  Invoking Right to Remain Silent

Washington argues that he unsuccessfully tried to invoke his right to remain silent twice during his interrogation.  [Dkt. 1 at 4-5.]  He argues that these invocations negated his waiver of his *Miranda* rights.  [*Id.* at 4.]

The Respondent contends that Washington did not unambiguously invoke his right to remain silent after signing his *Miranda* waiver and that the Indiana Supreme Court's decision on this issue is in accordance with clearly established federal law.  [Dkt. 10 at 19-20.]

The Indiana Supreme Court summarized the facts surrounding Washington's alleged invocation of the right to remain silent as follows:

> Washington directs our attention to that portion of the interrogation in which he at one point declared: "I'm tired of talking. I'm listening." He also directs our attention to another portion of the interrogation in which the following exchange occurred:
>
>> [Washington]: I'm not gonna say nothing man you're . . . you're just talking. What does it look like I'm not going to admit to something I didn't do. I'll let the jury decide that.
>>
>> [Officer Gilbert]: Are you telling us that those are not your clothes?
>>
>> [Washington]: I'm not saying a thing.

*Washington*, 808 N.E.2d at 623.

The Indiana Supreme Court rejected Washington's argument that he had invoked his right to remain silent, finding that

> [a]fter declaring that he was "tired of talking" and that he was not going to say anything, Washington continued to engage the interrogating officers in conversation. The record shows that several times Washington questioned the officers concerning the strength of evidence against him. And at one point when Officer Heilman asked Washington whether he wanted the questioning to stop Washington responded, "I want to see the pictures there." Washington's comments do not demonstrate an assertion of his Fifth Amendment right to remain silent.

*Id.*

An accused who wants to invoke his or her right to remain silent must do so unambiguously. *Berghuis v. Thompkins*, 130 S. Ct. 2250, 2260 (2010). A requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that "avoid[s] difficulties of proof and . . . provide[s] guidance to officers" on how to proceed in the face of ambiguity. *Id.* "[A]s *Miranda* holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process." *Id.* (citation omit-

ted).  A suspect who tells a police officer that he isn't going to talk about anything "is as much a taunt—even a provocation—as it is an invocation of the right to remain silent." *United States v. Sherrod*, 445 F.3d 980, 982 (7th Cir. 2006).

The Court concludes that the Indiana Supreme Court's decision was consistent with federal law.  The statements on which Washington relies do not unambiguously invoke a right to remain silent and, as the Seventh Circuit recognized in *Sherrod*, are as much of a taunt as an invocation of the right.  *Id.*  Additionally, after making one of the ambiguous statements at issue, Washington affirmatively asked the officer to show him some of the pictorial evidence, which is a "course of conduct indicating waiver" of the right he now claims he intended to invoke. *Berghuis*, 130 S.Ct. at 2263.

For these reasons, the Court rejects Washington's arguments that he is entitled to habeas relief because he allegedly invoked his right to remain silent during the interrogation.

### 2)  Voluntary Manslaughter Jury Instruction

Washington argues that the trial court erred when it concluded that there was no evidence of sudden heat to justify giving a jury instruction about voluntary manslaughter, which is a lesser-included offense of murder.  [Dkt. 1 at 5.]  Washington presented this argument to the Indiana Supreme Court on direct appeal, but it was rejected.  *Washington*, 808 N.E.2d at 625-26 (affirming trial court's decision not to give voluntary manslaughter instruction because Washington's decision to wait several hours after seeing Bass with another man, prepare for the attack, and wait for Bass to return before attacking her "shows a degree of deliberation and cool reflection inconsistent with sudden heat").

In response, the Respondent emphasizes that this Court cannot grant federal habeas relief based on a state court's alleged misapplication of state law.  [Dkt. 10 at 21-22.]  The Respondent

points out that Washington did not present this issue as a violation of federal law on direct appeal.  [*Id.* at 21.]

Washington succinctly replies that his federal due process rights were violated by the trial court's failure to give the requested jury instruction.  [Dkt. 17 at 10-11.]  He incorporates his appellate briefs filed on direct appeal.  [*Id.*]

"In general, the failure of a state trial court to instruct the jury on a lesser offense does not implicate a federal constitutional question and will not be considered in a federal habeas corpus proceeding."[2]  *Reeves v. Battles*, 272 F.3d 918, 920 (7th Cir. 2001).  "[T]he question is not whether the failure to instruct on a lesser included offense was correct or incorrect under state law, but rather whether failure to do so constituted a defect so fundamental that it results in a complete miscarriage of justice or omission inconsistent with the standards of fair procedure."  *Id.*  When the alleged error is an omission of a requested instruction, a habeas petitioner's burden is "especially heavy" because an omission is "less likely to be prejudicial than a misstatement of the law."  *Id.*

Washington argues that this Court is bound by *Sanders v. Cotton*, 398 F.3d 572, 583 (7th Cir. 2005), [dkt. 17 at 10-11], but *Sanders* is distinguishable from Washington's case.  The petitioner in *Sanders* successfully obtained habeas relief because the trial court had concluded that

_____

[2] The Court agrees with the Respondent that it does not appear that Washington directly posited the trial court's refusal of the proffered voluntary manslaughter instruction as a violation of federal law on direct appeal.  [Dkts. 10-5 at 24-26; 10-7 at 5.]  "Inherent in the habeas petitioner's obligation to exhaust his state court remedies before seeking relief in habeas corpus is the duty to fairly present his federal claims to the state courts."  *Lewis v. Sternes*, 390 F.3d 1019, 1025 (7th Cir. 2004) (citing 28 U.S.C. § 2254(b)(1)(A)).  But given that Washington argues that this Court is bound by Seventh Circuit precedent construing Indiana law regarding sudden heat instructions in a habeas proceeding, [dkt. 17 at 10-11 (citing *Sanders v. Cotton*, 398 F.3d 572 (7th Cir. 2005))], the Court will give Washington the "benefit of the doubt" about preserving this issue as a federal claim, *Charlton v. Davis*, 439 F.3d 369, 375 (7th Cir. 2006) (giving petitioner the "benefit of the doubt on whether he properly preserved [a jury instruction issue] as a federal, as opposed to state law, claim" and distinguishing *Sanders*).

- 22 -

he presented evidence supporting a sudden heat defense but then erroneously instructed the jury regarding sudden heat and the State's burden of proof. 398 F.3d at 582. In Washington's case, the trial court determined that Washington did *not* present sufficient evidence of sudden heat and, thus, the jury was not instructed on that issue. *Washington*, 808 N.E.2d at 626 ("In this case the trial court made an explicit finding that there was an absence of sudden heat."). Because Washington does not argue that the instructions the trial court actually gave were erroneous, *Sanders* is inapplicable. *See Keeran v. Pollard*, 2005 WL 3435089, at *7 (E.D. Wis. 2005) (distinguishing *Sanders* because the trial court in *Keeran* concluded that petitioner did not present evidence of sudden heat and, thus, did not instruct the jury on that issue).

The Court is convinced that the denial of Washington's request for an instruction on voluntary manslaughter did not result in a wrongful conviction that violated his due process rights. A trial court does not err in refusing to tender an instruction unsupported by sufficient evidence. *Reeves*, 272 F.3d at 920. As the Indiana Supreme Court pointed out on direct appeal, Washington's decision to wait several hours after seeing Bass with another man, get a knife, cover his hands with socks, and wait for Bass to return before attacking her "shows a degree of deliberation and cool reflection inconsistent with sudden heat." *Washington*, 808 N.E.2d at 625-26. Given that evidence, the trial court's refusal to give Washington's proffered jury instruction does not amount to a fundamental miscarriage of justice and his due process rights were not violated. Accordingly, Washington is not entitled to habeas relief.

## IV.
### CONCLUSION

The Court has carefully reviewed the state record in light of Washington's claims and has given such consideration to those claims as the limited scope of its review in a habeas corpus proceeding permits. "Section 2254(d) reflects the view that habeas corpus is a 'guard against

extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in judgment)).  The deference due to state court decisions "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington*, 131 S. Ct. at 786; *see also Cavazos v. Smith*, 132 S. Ct. 2, 7-8 (2011) (per curiam) (citing Supreme Court jurisprudence "highlighting the necessity of deference to state courts in § 2254(d) habeas cases").  Washington's habeas petition does not present such a situation and that petition is therefore **DENIED**.  Amended Judgment consistent with this Entry shall now issue.

Pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing § 2254 proceedings, and 28 U.S.C. § 2253(c), the Court finds that Washington has failed to show that reasonable jurists would find "it debatable whether the petition states a valid claim of the denial of a constitutional right" and "debatable whether [this Court] was correct in its procedural ruling[s]." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  The Court, therefore, denies a certificate of appealability.

10/11/2013

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via US Mail:**

JEFFREY WASHINGTON
862899
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
6908 S. Old US Hwy 41
P.O. Box 1111

CARLISLE, IN 47838

**Distribution via ECF only**:

Henry A. Flores, Jr.
INDIANA ATTORNEY GENERAL
henry.flores@atg.in.gov